Case No. 24-2288

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

ASHOK ARORA,

              Plaintiff-Appellant,

v.

Midland Credit Management, Inc.,
Midland Funding LLC,

              Defendant-Appellees

Appeal from the United States
District Court for the Northern
District of Illinois
(Case No.: 1:15-cv-06109)

Honorable Jeremy C. Daniel

**<u>PLAINTIFF-APPELLANT'S REPLY BRIEF</u>**

Ashok Arora
869 E Schaumburg Rd 217
Schaumburg, IL 60194
Telephone: 224-622-3846
Email: ashoklaw@protonmail.com
*Pro Se Plaintiff-Appellant*

# TABLE OF CONTENTS

Plaintiff-Appellant's Brief Errata .................................................................................4

Statement of the Case .................................................................................................5

Summary of the Argument .........................................................................................7

    I.   Reply to Defendant-Appellees Argument II .....................................................7

    II.  Reply to Defendant-Appellees Argument I .......................................................8

    III. Reply to Defendant-Appellees Argument III .................................................10

Argument .................................................................................................................11

    I.   Reply to Defendant-Appellees Argument II ...................................................11

    II.  Reply to Defendant-Appellees Argument I .....................................................15

    III. Reply to Defendant-Appellees Argument III .................................................22

Certificate of Compliance .........................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Brackett v. Peters*, 11 F.3d 78 (7th Cir. 1993) ................................................................21

*Dupree v. Younger*, 143 S.Ct. 1382, 215 L.Ed.2d 636 (2023)..................................10, 23

*Gadelhak v. AT&T Servs.*, Inc., 950 F.3d 458 (7th Cir. 2020) ...............................17, 18

*Hart v. Credit Control*, LLC, 871 F.3d 1255 (11th Cir. 2017).....................................17

*Lancaster v. Norfolk and Western Ry. Co.*, 773 F.2d 807 (7th Cir. 1985) ....................20

*Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) ........................18

*Valenta v. Midland Funding, LLC* (N.D. Ill. 2019) .......................................................14

**Statutes**

15 U.S.C. § 1692d(5) ...................................................................................8, 9, 16. 17

15 U.S.C. § 1692d(6) ...................................................................................8, 9, 16. 17

Fed. R. App. Proc. 3(c)(4) ...............................................................................................22

Fed. R. Evid. 602 ...................................................................................................11, 12

Fed. R. Evid. 803(6) .......................................................................................7, 11, 12

Fed. R. Evid. 803(7) .......................................................................................7, 11, 12

**Other Authorities**

## PLAINTIFF-APPELLANT'S BRIEF ERRATA

1.     The following corrections apply to Plaintiff-Appellant's Brief filed September 4, 2024 (Doc 4) ("Brief"):

| Brief Page No. | Entry | Correction |
|---|---|---|
| 44 | (Dkt No. 134) | (Dkt No. 134 Exhibit 1) or |
|  |  | (Dkt No. 134-1) |

2.     On 9/30/2024, the district court struck the documents "DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' MDL DISCOVERY REQUESTS" (Dkt No. 180) and "DEFENDANTS' WRITTEN DESCRIPTION OF DIALING TECHNOLOGY" (Dkt No. 181) from the docket on motion by Defendant-Appellees. These two documents are part of the MDL record (MDL Dkt No. 802 Exhibits 3, 4) (MDL Dkt Nos. 802-3, 802-4) and Plaintiff-Appellant had re-filed them in the district court. Plaintiff-Appellant references these document in his appeal challenging the MDL court's discovery ruling. References to Dkt No. 180 and 181 in the Brief can be replaced with references to MDL Dkt No. 802-3 and 802-4 as follows.

| Brief Page No. | Entry | Correction |
|---|---|---|
| 10 | (Dkt No. 181) | (MDL Dkt No. 802-4) |
| 12 | (Dkt No. 180) | (MDL Dkt No. 802-3) |
| 48 | (Dkt No. 180 at 17:5-7) | (MDL Dkt No. 802-3 at 17:5-7) |
| 50 | (Dkt No. 181) | (MDL Dkt No. 802-4) |

## STATEMENT OF THE CASE

Plaintiff-Appellant found following errors in Defendant-Appellees' Statement of the Case (Doc 14 ("Resp-Brief") at p. 2-9).

1.      Defendant-Appellees' Statement: "Arora timely filed a notice of appeal. Doc. 162, PageID # 5030. The decisions appealed are: (1) the Summary Judgment Order; and (2) the June 26, 2024 order and judgment in MCM and MF's favor. Id." Resp-Brief at p. 3.

**Reply:** Plaintiff-Appellant's notice of appeal does not limit the decisions appealed to summary judgment and the final judgment. The notice of appeal states "Plaintiff Ashok Arora appeals … from the final judgment entered on June 28, 2024 (Dkt Nos. 160, 161) *and prior orders including, but not limited to*, the January 10, 2023 order granting partial summary judgment to defendants (Dkt No. 112)." (Dkt 162 at 1) (Emphasis added).

2.      Section titled "A. Evidence Adduced at the Bench Trial". Resp-Brief at p. 3-7.

**Reply**: Defendant-Appellees repeat almost verbatim statements from the final judgment of the district court. Those statements are district court's interpretation of the evidence and Plaintiff-Appellant disputes some of them in his opening brief.

3.      Defendant-Appellees' Statement: "Pariseau testified at trial, where Arora offered her declarations into evidence and elicited her testimony regarding MF's and MCM's lack of knowledge about the debts that MCM was trying to collect. Doc. 160, PageID # 5025 (SA 5)." Resp-Brief at p. 9.

**Reply**: Plaintiff-Appellant elicited Pariseau's testimony regarding her declaration: "The Subject Account was sold by Navy Federal Credit Union ("NFCU") to Asset Acceptance, LLC ("Asset Acceptance") on or about April 27, 2012, and was then subsequently sold to Midland Funding on November 21, 2013". Plaintiff elicited her testimony for one reason only: to

determine the extent to which her statement was based on her personal knowledge. Her testimony revealed that she had no personal knowledge of the sale transaction. Since the trial was regarding Plaintiff-Appellant's intrusion upon seclusion claim and not about the FDCPA claim, Plaintiff-Appellant made no attempt to elicit any testimony regarding the debt or the purpose of the debt.

## SUMMARY OF THE ARGUMENT

I.   **Reply to Defendant-Appellees' Argument II that "THE DISTRICT COURT PROPERLY GRANTED DEFENDANTS SUMMARY JUDGMENT ON THE FDCPA CLAIMS" (Resp-Brief at p. 19-21)**

Defendant-Appellees argue that "Pariseau's declarations were competent evidence based on her personal knowledge." Plaintiff-Appellant very much disputes that.

In her declarations, Pariseau does not assert that she was either involved in or was a witness to any of the transactions to which testifies—for example, the sale of the debt by NFCU to Asset Acceptance. Instead, Pariseau claims personal knowledge of the transaction after review of the Defendant-Appellees' records. Knowledge derived from reviewing the records prepared by another is not personal knowledge, it is hearsay. Plaintiff-Appellant believes it is for this reason the district court chose to accept Pariseau's declarations under Fed. R. Evid. 803(6) and 803(7) exceptions to hearsay for business records. Plaintiff-Appellant is appealing the district court's acceptance of Pariseau's declarations under Fed. R. Evid. 803(6) and 803(7) because declarations are not business records.

During examination at the trial—which was limited to Plaintiff-Appellant's intrusion upon seclusion claim and did not retroactively impact the summary judgment ruling on the FDCPA claim—Pariseau acknowledged that she had no personal knowledge of the facts asserted in her declarations. Her trial testimony further revealed that those facts were mostly assumptions and conjectures because she did not have access to all of the relevant business records. For example, Pariseau had asserted in her declaration that the account was sold by NFCU to Asset Acceptance. In her trial testimony, Pariseau admitted that she had no involvement in the sale and that she had not viewed the bill of sale for the transaction because she did not have access to it.

## II.    Reply to Defendant-Appellees' Argument I that "THE DISTRICT COURT PROPERLY FOUND IN FAVOR OF MCM ON THE STATE LAW INTRUSION UPON SECLUSION CLAIM" (Resp-Brief at p. 14-19)

Defendant-Appellees' first argument is that "while Arora did not have a duty to inform MCM that he was not Elizabeth Adams or did not wish to receive the calls, [...] a reasonable person would not have waited so long to tell MCM that they had the wrong number." Defendant-Appellees are attempting to confuse the issue. The second element of the intrusion upon seclusion claim requires that the intrusion be "highly offensive or objectionable to a reasonable person." The focus of the element is clearly on the actions of the intruder. It does not require the victim to act reasonably or to act at all.

Defendant-Appellees next question the relevance of the FDCPA §§ 1692d(5) and 1692d(6)—cited by Plaintiff-Appellant in his Brief—to the intrusion upon seclusion claim. Plaintiff-Appellant cited the FDCPA sections for the following reasons:

i)   The intrusion has to be highly offensive or objectionable to a reasonable person.

ii)  The United States Congress can be assumed to be made up of reasonable persons.

iii) In enacting the FDCPA, the Congress found that the "natural consequence" of causing a telephone to ring repeatedly or placement of calls without meaningful disclosure of the caller's identity is to annoy, abuse, or harass the person at the called number. §§ 1692d(5), 1692d(6). The Congress found such calls to be highly offensive even when the caller is a debt collector and the called party is a debtor who has defaulted on his or her debt.

iv) Defendant-Appellee MCM is a debt collector and claims to have placed the calls to Plaintiff-Appellant's cell phone in order to collect a debt owed by a person named Elizabeth Adams.

v) The harms identified by the FDCPA §§ 1692d(5) and 1692d(6) are analogous to the intrusion upon seclusion.

Defendant-Appellees' third argument is that "Arora failed to produce any evidence that he suffered any concrete injury". Defendant-Appellees overlook the fact that the tort of intrusion upon seclusion itself is a concrete injury.

Defendant-Appellees' fourth argument is that "the evidence in fact established that MCM's calls did not cause Arora to stop working, because he completed a project on which he had been working for the better part of the period during which MCM made its calls." Nothing in the evidence—Plaintiff-Appellant's deposition testimony or trial testimony—supports the conclusion that "he completed a project on which he had been working". On the contrary, Plaintiff-Appellant testified that his work performance suffered, the client found a replacement and terminated his contract, and the reason he lasted so long on the project was because it took a while for the client to find a replacement.

Defendant-Appellees' final argument is that "Arora attributed most of his concerns to an alleged but unsubstantiated conspiracy by several credit and law enforcement agencies to track Arora's cellular telephone, which Arora acknowledged was the source of much of his angst." Plaintiff-Appellant disputes the characterization that he attributed most of his concerns to an alleged conspiracy. Plaintiff-Appellant attributes all of his damages to Defendant-Appellees' phone calls. Even if one were to assume that much of Plaintiff-Appellant's angst was the result of his psychosis—his attaching conspiracies to the calls where none existed, and his seeing call

9

patterns where none existed—there is no denying that his psychosis, if any, was triggered by Defendant-Appellees phone calls. Under the "eggshell-skull rule", Defendant-Appellees are still responsible for all of the damages caused by their phone calls because "The tortfeasor takes his victim as he finds him".

**III.    Reply to Defendant-Appellees' Argument III that "ARORA'S CHALLENGE TO THE DISTRICT COURT'S DISCOVERY RULINGS IN THE MDL IS IMPROPER BECAUSE THESE RULINGS ARE NOT PART OF THIS APPEAL AND, EVEN IF THESE RULINGS COULD BE CHALLENGED, THEY WERE WITHIN THE DISTRICT COURT'S DISCRETION." (Resp-Brief at p. 21-22)**

The challenges to the MDL court's discovery rulings are proper in this appeal because "The jurisdiction of the Courts of Appeals under 28 U.S.C. § 1291 is limited to appeals from ... final decisions of the district courts. Interlocutory orders—those that do not dispose of the whole case, like denials of summary judgment—are typically not immediately appealable under § 1291. Instead, the general rule is that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated." *Dupree v. Younger*, 143 S.Ct. 1382, 1388, 215 L.Ed.2d 636 (2023) (internal quotes omitted).

## ARGUMENT

I. **Reply to Defendant-Appellees' Argument II that "THE DISTRICT COURT PROPERLY GRANTED DEFENDANTS SUMMARY JUDGMENT ON THE FDCPA CLAIMS" (Resp-Brief at p. 19-21)**

A. **Defendant-Appellees first argue** that "Pariseau's declarations, submitted in accordance with the district court's discovery order, were competent evidence based on her own personal knowledge." (Resp-Brief at p. 21).

**Reply**: Plaintiff-Appellant disputes Pariseau's declarations were based on her personal knowledge or that her declarations were permissible evidence under Fed. R. Evid.

It is clear from the district court's summary judgment ruling—SA 9-SA 37 ("SummJudg")—that, while the court accepted Plaintiff-Appellant's declarations based on his personal knowledge under Fed. R. Evid. 602, the court accepted Pariseau's declarations (Dkt No. 85 at 10-15 (Exhibits B, C)) only under Fed. R. Evid. 803(6) and 803(7) exceptions for business records. (SA 12 (SummJudg at 4)).

Pariseau asserts following facts in her declaration on behalf of Defendant-Appellee MCM (the declaration for Midland Funding—Exhibit C—is identical to Exhibit B except that the name Midland Funding replaces MCM):

i) "As part of my regular job duties, I have access to and routinely review account records maintained by MCM. I am authorized to make this affidavit on behalf of MCM. The statements made in this Affidavit are based on my personal knowledge after review of MCM's business records." (Dkt No. 85 at 11 (Exhibit B) ¶ 2)

ii) "The Subject Account was sold by Navy Federal Credit Union ("NFCU") to Asset Acceptance, LLC ("Asset Acceptance") on or about April 27, 2012, and was then

subsequently sold to Midland Funding on November 21, 2013." (Dkt No. 85 at 12 (Exhibit B) ¶ 4).

Pariseau does not assert that she was either involved in or was a witness to the sale of the subject account from NFCU to Asset Acceptance or from Asset Acceptance to MCM. Her only claim to personal knowledge is based on her review of the Defendant-Appellees' records. The Federal Rules of Evidence do not define the term "personal knowledge". However, based on the case law, it appears to Plaintiff-Appellant that "personal knowledge" means knowledge gained from first-hand experience. Therefore, knowledge derived from records prepared by another person cannot be personal knowledge. Otherwise, all knowledge would be personal knowledge. This possibly explains why the district court accepted Pariseau's declarations under Fed. R. Evid. 803(6) and 803(7) exceptions for business records and not under Fed. R. Evid. 602. However, whether a court may accept declarations—supposedly derived from the business records—in lieu of the business records themselves under Fed. R. Evid. 803(6) or 803(7) is one of the issues in this appeal (Brief at p. 5 Issue #2).

Pariseau was called as a witness at the trial. The trial was only regarding the intrusion upon seclusion claim since Defendant-Appellees had been already granted summary judgment on the FDCPA and TCPA claims. Plaintiff-Appellant questioned Pariseau at trial for one reason only—to learn the extent to which her statement concerning the sale of the account from NFCU to Asset Acceptance and from Asset Acceptance to Midland Funding (Dkt No. 85 at 12 (Exhibit B) ¶ 4) was based on her personal knowledge. Pariseau testified at the trial that she had no involvement in the sale (Trial-Day2 at 97:23-25 100:1-14) and that she had not even reviewed the relevant bills of sale because she did not have access to them (Trial-Day2 at 101:21-25 102:1-10). She also testified that all her information regarding the account came from a record

called "account notes" (Trial-Day2 at 99:5-12). Plaintiff-Appellant did not ask Pariseau to explain the term "account notes" as it is a standard term used across the debt collection industry to denote the record where debt collectors records all their debt collection activities. It appears Pariseau assumed that because account notes listed NFCU and Asset Acceptance as the previous owners of the account, the account must have been sold by NFCU to Asset Acceptance and then by Asset Acceptance to Midland Funding. (Trial-Day2 at 99:1-25 100:1-4). While it may have been a reasonable assumption, it was still that—an assumption, a conjecture.

  **B.**  **Defendant-Appellees next argue** that "As the Summary Judgment Order properly found, [...] Defendants had no information that they were consumer debts." (Resp-Brief at p. 21).

  <u>Reply</u>: The district court relied on the following statement by Pariseau in her declarations to conclude that Defendants-Appellees had no information regarding the purpose of that debt.

> "From the records in MCM's file relating to the Subject Account, MCM cannot determine whether the Subject Debt was incurred primarily for "personal, family, or household purposes." 15 U.S.C. § 1692a(5). More specifically, MCM does not have in its possession documents related to the Subject Account which show the types of charges that gave rise to the Subject Debt, the items purchased that led to the Subject Debt, or where the purchases were made." (Dkt No. 85 at 12 (Exhibit B) ¶ 5).

See SA 26 (SummJudg at 18) ("Midland and Funding, however, have sworn that they have no records from which they can determine the nature of Adams's debt. (Midland Dec. ¶¶ 3–5; Funding Dec. ¶¶ 3–5.)").

  Plaintiff-Appellant did not question Pariseau regarding this statement because the trial was only regarding the intrusion upon seclusion claim and the purpose of the debt was not

relevant to the intrusion claim. However, with no business records in evidence, Plaintiff-Appellant sees many issues with accepting Pariseau's declarations as facts. For example:

i) Given Pariseau's admission at trial that she was not privy to all of the records Defendant-Appellees' have in their possession regarding the subject account, and given that Pariseau made an assumption that the account was sold by NFCU to Asset Acceptance and by Asset Acceptance to Midland Funding and asserted these as facts in her declaration without reviewing the pertinent bills of sale, one has to wonder whether Defendant-Appellees truly do not have information regarding consumer's purchase transactions or was the transaction information simply inaccessible to Pariseau. It appears that Defendant-Appellees have produced consumers' transaction records in cases where producing those records was to their advantage. See *Valenta v. Midland Funding, LLC*, at 6 (N.D. Ill. 2019) ("Defendants argue that there is a genuine factual dispute over whether the Synchrony Bank account was primarily for personal purposes rather than business purposes, given that plaintiff is a handyman and credit card statements appear to show that the debt that plaintiff could not pay was for a purchase of mortar and grout at Lowe's. Plaintiff responds that he did use the Synchrony Bank credit card account primarily for personal purposes; at his deposition, he testified that he used the card for such things as gas, clothing, or other personal items.") (Internal quotes omitted).

ii) Plaintiff-Appellant also wonders if Pariseau reviewed the correct account. There were multiple collection lawsuits against persons named Elizabeth Adams in Cook County alone at the time of Defendant-Appellees' collection calls. For example, Cook County case numbers M1-14-126003 (Dkt No. 92-5) and M1-14-135185 (Dkt No. 92-6). Defendant-Appellees claim to be one of the largest debt buyers in the country with

millions of accounts. There is a good chance that they have collection accounts for more than one Elizabeth Adams.

Pariseau's declarations and trial testimony are unreliable for other reasons as well. For example, during direct examination by Plaintiff-Appellant, Pariseau testified that she was an employee of MCM since October 12, 2003. (Trial-Day2 at 96:8-20). That was an untrue statement. The defense counsel then came to her rescue and asked her about her employment again. Pariseau then stated that she became an employee of Asset Acceptance in 2003, and that she was an employee of Asset Acceptance until its merger with MCM (Trial-Day2 at 111:12-25 112:1). Asset Acceptance was acquired by MCM's parent company, Encore Capital Group, in 2013. (Brief at p. 8). So any merger with MCM likely occurred in 2013 or later. *Id.*

## II. Reply to Defendant-Appellees' Argument I that "THE DISTRICT COURT PROPERLY FOUND IN FAVOR OF MCM ON THE STATE LAW INTRUSION UPON SECLUSION CLAIM" (Resp-Brief at p. 14-19)

A. **Defendant-Appellees first argument** is that "while Arora did not have a duty to inform MCM that he was not Elizabeth Adams or did not wish to receive the calls, Arora's inaction provided context for whether a reasonable person would find the calls objectionable or highly offensive. […] a reasonable person would not have waited so long to tell MCM that they had the wrong number." (Resp-Brief at p. 14)

**Reply**: Defendant-Appellees are attempting to confuse the issue. The second element of the intrusion upon seclusion claim requires that the intrusion be "highly offensive or objectionable to a reasonable person." The focus of the element is clearly on the actions of the intruder. It does not require the victim to act reasonably or to act at all.

The parties were basically at an impasse. Plaintiff-Appellant did not want to speak with a caller from an unknown number until the caller identified self and Plaintiff-Appellant was able to verify the caller as a legitimate business. It appears MCM, on the other hand, just did not want to take the trouble of leaving a voicemail identifying itself. Plaintiff-Appellant believes the only relevant question with respect to the second element is whether MCM's 240 calls—where MCM never identified themselves on any of the calls, and placed 152 of those 240 calls within the first 2 months with 3 to 4 calls on most days—would be highly offensive or objectionable to a reasonable person.

**B.** __Defendant-Appellees next question__ the relevance of the FDCPA §§ 1692d(5) and 1692d(6)—cited by Plaintiff-Appellant in his brief—to the intrusion upon seclusion claim: "Unlike *Losch*, Arora's claim is for intrusion upon seclusion – not Section 1692d(5) of the FDCPA." (Resp-Brief at p. 17). "Arora's argument that MCM violated Section 1692d(6) of the FDCPA, 15 U.S.C. § 1692d(6), which requires 'meaningful disclosure of the caller's identity' is irrelevant to the state law intrusion of seclusion claim." (*Id.*)

__Reply__: Plaintiff-Appellant cited the FDCPA sections for the following reasons:

vi) The intrusion has to be highly offensive or objectionable to a reasonable person.

vii) The United States Congress can be assumed to be made up of reasonable persons.

viii) In enacting the FDCPA, the Congress found that the "natural consequence" of causing a telephone to ring repeatedly or placement of calls without meaningful disclosure of the caller's identity is to annoy, abuse, or harass the person at the called number. §§ 1692d(5), 1692d(6). The Congress found such calls to be highly offensive even when the caller is a debt collector and the called party is a debtor who has defaulted on his or her debt.

ix) Defendant-Appellee MCM is a debt collector and claims to have placed the calls to Plaintiff-Appellant's cell phone in order to collect a debt owed by a person named Elizabeth Adams. Incidentally, Plaintiff-Appellant does not know anyone named Elizabeth Adams.

x) The harms identified by the FDCPA §§ 1692d(5) and 1692d(6) are analogous to the intrusion upon seclusion. "Courts have also recognized liability for intrusion upon seclusion for irritating intrusions—such as when 'telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff.'" *Gadelhak v. AT&T Servs.*, Inc., 950 F.3d 458, 462 (7th Cir. 2020) (citing RESTATEMENT § 652B cmt. d ).

The FDCPA does not define the term "meaningful disclosure" used in § 1692d(6). However, several courts have found that "meaningful disclosure" means the name of the debt collection company and that it is a debt collector. "The identity of the caller is meaningfully disclosed provided that both the name of the debt collection company and the nature of the company's business are disclosed." *Hart v. Credit Control*, LLC, 871 F.3d 1255, 1260 (11th Cir. 2017).

While under the FDCPA, a single call that violates § 1692d(6) may be sufficient to impose liability on the caller, the common law intrusion upon seclusion requires more than a few calls. "A few unwanted automated text messages may be too minor an annoyance to be actionable at common law. But such texts nevertheless pose the same *kind* of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable." *Gadelhak v. AT&T Servs.*, Inc., 950 F.3d 458, 463 (7th Cir. 2020).

Therefore, Plaintiff-Appellant believes the issue ultimately comes down to whether MCM's 240 calls to Plaintiff-Appellant's cell phone—where MCM never identified itself on any of the calls, and placed 152 of the 240 calls within the first 2 months with 3 to 4 calls on most days—were sufficiently numerous to be offensive or objectionable to a reasonable person. Incidentally, Plaintiff-Appellant did not owe any debt to Defendant-Appellees.

**C.** **Defendant-Appellees third argument** is that "Arora did not offer competent evidence to establish that he suffered any injuries, let alone injuries from MCM's calls. Specifically, Arora failed to produce any evidence that he suffered any concrete injury" (Resp-Brief at p. 18).

**Reply**: The intrusion upon seclusion itself is a concrete injury. "Various intangible harms can also be concrete. [...] Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2204, 210 L.Ed.2d 568 (2021).

The facts cited by Defendant-Appellees in their statement of the case contradict their argument. For example, Defendant-Appellees state that "According to Arora, these calls initially annoyed him but later made him angry" (Resp-Brief at p. 4). Defendant-Appellees do not contradict this fact and have offered no evidence to contradict this fact. The unwanted calls annoyed Plaintiff-Appellant because they intruded on his senses and sensibilities and invaded his privacy. When the unwanted calls persisted day after day, and month after month, the calls made him angry because their effect was cumulative. Why else would the tort of inclusion upon seclusion require multiple calls to be actionable? The Seventh Circuit has recognized liability for irritating intrusions such as unwanted phone calls. See *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) ("Courts have also recognized liability for intrusion upon seclusion for

irritating intrusions—such as when "telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff.") Plaintiff believes that if this court finds that MCM's 240 calls to Plaintiff-Appellant's cell phone—where MCM never identified itself on any of the calls, and placed 152 of the 240 calls within the first 2 months with 3 to 4 calls on most days—were sufficiently numerous to be offensive or objectionable to a reasonable person, then Plaintiff-Appellant has already proven one intangible injury—the invasion of privacy. There is no denying the fact that Defendant-Appellees called Plaintiff-Appellant's cell phone number 240 times, thereby causing his cell phone to ring 240 times, intruding on his senses and his privacy, annoying and angering him. Plaintiff-Appellant even picked up 30 of those calls. To conclude that MCM's 240 calls—where MCM never identified itself on any of the calls, and placed 152 of the 240 calls within the first 2 months with 3 to 4 calls on most days—would be highly offensive to a reasonable person and at the same time to conclude that there was no invasion of privacy from these calls would be contradictory.

The persistent unwanted calls from Defendant-Appellees caused a lot more damage which is described in the next two replies.

**D.** **Defendant-Appellees fourth argument** is that "Arora failed to present competent evidence that he lost work due to MCM's calls. Rather, as the district court found, the evidence in fact established that MCM's calls did not cause Arora to stop working, because he completed a project on which he had been working for the better part of the period during which MCM made its calls." (Resp-Brief at p. 18).

**Reply**: Nothing in the evidence—Plaintiff-Appellant's deposition testimony or trial testimony—supports the conclusion that "he completed a project on which he had been working". On the contrary, Plaintiff-Appellant testified that his performance suffered, the client

found a replacement and terminated his contract, and the reason he lasted so long on the project was because it took a while for the client to find a replacement. Plaintiff-Appellant also testified that he had stopped working on his own product development because of the distractions caused by Defendant-Appellees' frequent intrusive phone calls and did not pursue new consulting opportunity because he began receiving phone calls from Defendant-Appellees again.

**E.** **Defendant-Appellees' final argument** is that "Arora attributed most of his concerns to an alleged but unsubstantiated conspiracy by several credit and law enforcement agencies to track Arora's cellular telephone, which Arora acknowledged was the source of much of his angst. (Resp-Brief at p. 18).

**Reply**: Plaintiff-Appellant disputes the characterization that he attributed most of his concerns to an alleged conspiracy. Plaintiff-Appellant attributes all of his damages to Defendant-Appellees' phone calls. His theories that he was being deliberately targeted with the wrong number calls and that the callers appeared to be tracking his cell phone activity were based on the pattern and timing of the phone calls. Without the phone calls, there was no conspiracy theory.

But even if one were to assume that much of Plaintiff-Appellant's angst was the result of his overactive imagination or psychosis—his attaching conspiracies to the calls where none existed, and his seeing call patterns where none existed—does that mean Defendant-Appellees are off the hook for any and all damages caused by their phone calls? The answer appears to be NO! In fact, the answer appears to be that Defendant-Appellees are still responsible for all of the damages caused by their phone calls because "The tortfeasor takes his victim as he finds him" *Lancaster v. Norfolk and Western Ry. Co.*, 773 F.2d 807, 822 (7th Cir. 1985). "It has long been the rule in tort law (the 'thin-skull' or 'eggshell-skull' rule) not only that the tortfeasor takes his

victim as he finds him, but also that psychological vulnerability is on the same footing with physical. If for example the victim is predisposed to schizophrenia, and the tortfeasor inflicts a minor injury which precipitates the schizophrenia, he is liable for the entire consequences even though they were both highly unlikely and unforeseen." *Brackett v. Peters*, 11 F.3d 78, 81 (7th Cir. 1993).

As Plaintiff-Appellant has testified, he began receiving wrong number collection calls in the first week of 2010. The calls initially annoyed him but after a while started making him angry. At some point, he stopped answering calls from unknown phone numbers. The calls continued unabated for four (4) years at the rate of about 100 calls a year until December 2013 when Defendant-Appellees began their calls. By December 2013, Plaintiff-Appellant was highly sensitive to unwanted calls. For the most part of 2013—until October 25—Plaintiff-Appellant frequently resorted to switching off his cell phone to avoid receiving the unwanted calls. Therefore, Plaintiff-Appellant could be described as "Eggshell-skull" Plaintiff. Plaintiff-Appellant testified that he received about one call a week from unknown numbers for several weeks before Defendant-Appellees calls began. Defendant-Appellees started making 3 to 4 calls a day. Records show that Defendant-Appellees made 152 calls within the first 2 months. That volume of calls sent him over the edge. Plaintiff testified that he started experiencing headaches, had difficulty falling asleep, had digestive issues, and could not focus on his work. He was also diagnosed with high blood pressure although its exact cause is unknown. Plaintiff-Appellant eventually stopped working resulting in heavy financial losses.

**III.** **Reply to Defendant-Appellees' Argument III that "ARORA'S CHALLENGE TO THE DISTRICT COURT'S DISCOVERY RULINGS IN THE MDL IS IMPROPER BECAUSE THESE RULINGS ARE NOT PART OF THIS APPEAL AND, EVEN IF THESE RULINGS COULD BE CHALLENGED, THEY WERE WITHIN THE DISTRICT COURT'S DISCRETION." (Resp-Brief at p. 21-22)**

**A.** **Defendant-Appellees' first argument** is that "The appeal does not include discovery rulings made by the district court in the MDL." Resp-Brief at p. 21.

**Reply**: The rule 3(c)(4) of the Federal Rules of Appellate Procedure ("Appellate Rules") states that "The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal." In keeping with the Appellate Rule 3(c)(4), Plaintiff-Appellant's notice of appeal states that "Plaintiff-Appellant seeks a review of the final judgment, the summary judgment and other orders in the case". (App Doc 1-1 at 5). Plaintiff-Appellant was not required to identify in the notice of appeal each and every order that he was appealing that preceded the final judgment.

The MDL proceedings covered the discovery related to Plaintiff-Appellant's TCPA claim. In Plaintiff-Appellant's view, the deposition of Noble Systems was necessary for him to prove his TCPA claim. After remand from the MDL, the district court granted Defendant-Appellees summary judgment on the TCPA claim. Plaintiff-Appellant is appealing the MDL discovery order that denied his request to take a deposition of the dialer manufacturer and, consequently, also appealing the summary judgment on the TCPA claim.

The MDL discovery order was not immediately appealable because it was not the final decision in the case. It became appealable only after the final judgment was entered in the case.

"The jurisdiction of the Courts of Appeals under 28 U.S.C. § 1291 is limited to appeals from ... final decisions of the district courts. Interlocutory orders—those that do not dispose of the whole case, like denials of summary judgment—are typically not immediately appealable under § 1291. Instead, the general rule is that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated." *Dupree v. Younger*, 143 S.Ct. 1382, 1388, 215 L.Ed.2d 636 (2023) (internal quotes omitted).

**B.** **Defendant-Appellees second argument** is that "the magistrate judge allowed Arora to take that discovery. App. 6 – 11. Arora simply failed to take the deposition – even though he had months to do so." Resp-Brief at p. 21.

**Reply:** As Plaintiff-Appellant has already explained in his opening brief, taking the deposition of Noble Systems without dialer manuals was pointless. The documentation on Noble dialer originally produced by Defendant-Appellees (Dkt no. 99-3)—which appears to have been written by Defendant-Appellees themselves—avoided providing any information about the dialer which may lead to discovery that the dialer was an ATDS under the TCPA. Until Defendant-Appellees indicated that they did have dialer manuals and were going to produce them, none of the plaintiffs in the MDL came forward to take the deposition of Noble Systems.

Plaintiff-Appellant believes Defendant-Appellees committed a fraud upon the court when early on during discovery they declared to the court that "Defendants produced all of the documents and information required by the Questionnaire Order" (MDL Dkt No. 736 at 4 lines 16-17). Defendant-Appellees knew very well at that point of time that they were withholding thousands of pages of dialer manuals that were clearly responsive to the discovery requests. Plaintiff-Appellant, at that point of time, had no idea which manuals, if any, existed for the

dialer. Otherwise, Plaintiff-Appellant would have pointed them out in his motion to compel. It appears to Plaintiff-Appellant that Defendant-Appellees wanted to avoid summary judgment motion by plaintiffs in the MDL by any means possible—even if it meant committing a fraud upon the court. A successful motion for summary judgment on the ATDS issue by any one of the plaintiffs in the MDL would have meant success for all plaintiffs in the MDL. Although there were many plaintiffs in the MDL, only about four attorneys representing plaintiffs were actively participating in the discovery. Defendant-Appellees appear to have struck a deal with those attorneys to continue their dialer related discovery after remand. See MDL Dkt No. 725 at 2 lines 8-10 ("A group of 14 Plaintiffs, through their counsel, agreed with Midland to defer any such deposition until after this MDL litigation is concluded.") Defendant-Appellees had in fact sought the consolidation of the lawsuits into the MDL in the first place to reduce its litigation costs. The deals to continue dialer related discovery after remand made no economic sense for Defendant-Appellees unless the goal was to avoid a successful summary judgment motion by plaintiffs at the MDL level which, of course, would have been much more costly given the number of passive plaintiffs.

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Cir. R. 32(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5619 words.

2.     This document complies with the typeface requirements of Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced 12-point Times New Roman typeface using Microsoft Word 2007.

Date: November 12, 2024

Respectfully Submitted,

*A. V.*

Ashok Arora
869 E Schaumburg Rd 217
Schaumburg, IL 60194
Telephone: 224-622-3846
Email: ashoklaw@protonmail.com
*Pro Se Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I, Ashok Arora, hereby certify that on November 12, 2024, I filed the foregoing

PLAINTIFF-APPELLANT'S REPLY BRIEF by mail with the Clerk of Court and served on the

following attorneys of record by email and/or mail.

Todd Gale
Susan G. Feibus
Theodore W. Seitz
DYKEMA GOSSETT PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
tgale@dykema.com
sfeibus@dykema.com
tseitz@dykema.com
(312) 876-1700
*Attorneys for Defendant-Appellees*

Respectfully Submitted,

Ashok Arora
*Pro Se Plaintiff-Appellant*